UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TOTAL E&P USA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:16-cv-02674 |
| v. | § | |
| | § | JUDGE DAVID HITTNER |
| MARUBENI OIL & GAS USA, INC., | § | |
| | § | |
| Defendant. | § | |

## TOTAL E&P USA, INC.'S RESPONSE IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

Plaintiff TOTAL E&P USA, Inc. ("TEP USA") hereby submits its Response in Opposition to Marubeni Oil & Gas (USA), Inc.'s ("MOGUS") Motion for Partial Summary Judgment on Liability Under the MC 305 Operating Agreement [Doc. 25] (the "Motion" or "PSJ Motion")[1].  This Response in Opposition is supported by the Declaration of Lauren Abney, which is attached hereto as

---

[1] TEP USA hereby incorporates by reference as if set forth fully herein its Motion Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure to defer or deny MOGUS' Motion [Doc. 32], which remains pending before this Court.  Judge Atlas, in a related case, granted TEP USA's Rule 56(d) Motion finding that TEP USA had demonstrated a need for discovery in order to present facts in opposition to the Motion for Partial Summary Judgment.  Her reasoning applies equally here. Judge Atlas' Memorandum and Order was filed as Doc. 37 in this case.

Exhibit 1 ("Abney Decl.") and the Declaration of Michael W. Mengis, which is attached hereto as Exhibit 2.[2]

## I.  SUMMARY OF THE ARGUMENT

MOGUS' requests that the Court, with virtually no factual predicate, find TEP USA is obligated to "pay its share of decommissioning" on the basis of two articles of the Operating Agreement[3] read in isolation – 18.4 and 24.1.4, even though TEP USA has not been a party to that Agreement for over 10 years. MOGUS' Motion should be denied for the following reasons:

### BASED ON FEDERAL LAW AND A FINAL ORDER IN THE ATP BANKRUPTCY CASE, MOGUS HAS NO RIGHT TO RECOVER PURSUANT TO THE OPERATING AGREEMENT

First, MOGUS' actions in the ATP bankruptcy preclude recovery from TEP USA because: (1) MOGUS voluntarily performed decommissioning as the designated operator under federal regulations, but was not the "Operator" under the terms of the Operating Agreement;[4] (2) MOGUS performed the decommissioning

---

[2] Currently pending is TEP USA's Motion to Remand [Doc. 2], which must be ruled on first before the Court considers MOGUS' PSJ Motion. *See Honey Holdings I, Ltd. v. Alfred L. Wolff, Inc.*, 81 F. Supp. 3d 543, 548 (S.D. Tex. 2015) ("Because the Court must determine that it has subject matter jurisdiction before it can rule on other matters, the Court addresses [the pending] motion to remand before numerous other pending motions.").

[3] "Operating Agreement" refers to the May 1, 1998 Offshore Operating Agreement Outer Continental Shelf Aconcagua Prospect Mississippi Canyon Area Block 305. The Operating Agreement is attached hereto as Exhibit 3.

[4] *See* Letter from Lars Herbst, Regional Dir., Bureau of Safety and Environmental Enforcement, to Keith Hubbard, Black Elk Energy Offshore Operations, LLC, &

2

in accordance with a Final Order, settlement, and Abandonment Fund Agreement dated February 27, 2014;[5] (3) under the Final Order MOGUS agreed that MOGUS was deemed to perform ATP's portion of the decommissioning – thereby extinguishing and mooting any potential responsibility for decommissioning that TEP USA may have had, either under federal law or the Operating Agreement, as asserted by MOGUS; and (4) pursuant to the Final Order any defaults that existed on the effective date of the Final Order were cut off by the assumption and cure of the Operating Agreement by ATP and the zero cure amount listed for defaults under the Operating Agreement thereby releasing ATP (and its predecessor TEP USA) from any decommissioning except as set forth in the Final Order and its attachments.

### MOGUS' FAILURE TO COMPLY WITH THE OPERATING AGREEMENT

Second, MOGUS does not present any evidence that it complied with the material terms of the Operating Agreement.[6]  MOGUS has not established that it was the Operator under the Agreement, that it obtained the proper approvals, that it

---

Perry Murphree, MOGUS (Apr. 17, 2014) (BSEE demanding MOGUS perform decommissioning obligations for MC 305 under federal regulations), attached hereto as Exhibit A to Abney Decl.

[5] The Final Order's attachments include the Abandonment Fund Agreement and the Cure Amounts Related to Assumed Contracts.  The Final Order is attached hereto as Exhibit 4.

[6] TEP USA has also filed contemporaneously herewith a Motion to Strike Summary Judgment Evidence.  What little "evidence" MOGUS filed does not comply with Rule 56 of the Federal Rules of Civil Procedure.

provided necessary information, or that it conducted the decommissioning operation in good faith or otherwise complied with the Agreement regarding Joint Operations.  The "Operator," as that term is defined in the Agreement, has the sole and exclusive right and duty to conduct all joint operations.  Since MOGUS was not the "Operator" under the terms of the Agreement, it had no right to incur any liability for the joint account.

### THERE ARE GENUINE FACT QUESTIONS THAT NEED TO BE RESOLVED

Third, many material facts are in dispute, all of which are essential and need to be resolved before this Court can rule on the Motion.  TEP USA has filed a Motion Pursuant to Rule 56(d) to deny or defer MOGUS' Motion and provided a detailed listing of these disputed facts.  These disputed facts and the need for discovery are more fully set forth in that motion.

### THE OPERATING AGREEMENT IS AT A MINIMUM AMBIGUOUS PRECLUDING THE RELIEF SOUGHT BY MOGUS

Fourth, MOGUS ignores several different provisions in the Operating Agreement that relate to the parties' responsibilities for plugging and abandonment and other decommissioning operations.  Under the detailed, negotiated provisions of the Operating Agreement, TEP USA does not have liability for the

decommissioning expenses as alleged by MOGUS and at best, the provisions are ambiguous providing a fact issue for a jury and precluding summary judgment.[7]

MOGUS says it seeks a narrow declaration on the basis of Articles 18.4 and 24.1.4. But defining this issue of law does not automatically make MOGUS entitled to summary judgment; MOGUS must show the law *as applied to the facts* entitles MOGUS to summary judgment.[8] MOGUS is improperly seeking a declaration without presenting sufficient evidence that each and every step has been taken and before any discovery has been conducted. Accordingly, MOGUS' Motion should be denied.

## II.   FACTUAL BACKGROUND

The Mississippi Canyon 305 block ("MC 305") lease terminated in 2013. TEP USA had divested itself of any interest in the lease covering MC 305 wells in 2006, when TEP USA assigned its interest to ATP Oil & Gas Corporation ("ATP"). MOGUS alleges that it acquired its interest in MC 305 from a third-party, in an agreement effective at least by 2006. During the period after ATP and MOGUS acquired their current interests in MC 305, ATP entered into an

---

[7] This Court has already ruled in an unrelated case that very similar provisions regarding AFE requirements and how they relate to decommissioning are ambiguous and presented a fact issue for a jury. *See Apache Corp. v. W&T Offshore, Inc.*, Civil Action No. H-15-0063 (S.D. Tex. Oct. 7, 2016). [Doc. 76]. This Court's Order in that case is attached hereto as Exhibit 5.

[8] *Carter v. Diamond URS Huntsville, LLC et al.*, Civ. A. No. H-14-2776, 136955 LEXIS (S.D. Tex. Sept. 30, 2016) (holding the "law as applied to the circumstances of the case" to support summary judgment).

arrangement with Shell on MC 348 so Shell could pursue development of a project known as Appomattox, and ATP retained an overriding royalty interest in the portion of MC 348 assigned to Shell.[9]  Both MC 305 and MC 348 were produced through a pipeline system known as the Canyon Express Pipeline System ("CEPS").  Over the period of several years, ATP and MOGUS evaluated how they would profit from MC 305, MC 348, and CEPS.

In August 2012, ATP filed for Chapter 11 protection and on information and belief continued working with MOGUS to determine the next steps for the assets, and the arrangements with Shell.  As part of the continued discussions between ATP and MOGUS, an arrangement was entered into with regard to the assets.  This arrangement was embodied in a series of compromises and settlements between ATP and MOGUS that were approved by the ATP Bankruptcy Court in the Final Order.

As part of the Final Order, ATP assumed but did not assign the MC 305 Operating Agreement, and MOGUS was designated operator of the MC 305 lease under federal regulations.  In the Final Order and the Abandonment Fund Agreement made a part of the Final Order, MOGUS also received a portion of the ATP overriding royalty interest in Appomattox, all of ATP's interests in the CEPS, and equipment referred to in the Final Order as the CE Inventory.  In return for this

---

[9] *See* Exhibits 6 & 7.

consideration, the Abandonment Fund Agreement was specific as to the conduct of decommissioning with regard to MC 305.   In paragraphs 4 and 5 of the Abandonment Fund Agreement, ATP was required to conduct the decommissioning and to the extent MOGUS conducted the decommissioning of the MC 305 wells, the decommissioning was deemed to be on ATP's behalf.

## III.  ARGUMENT

**A.    As a result of the Final Order and Abandonment Fund Agreement, MOGUS became liable for the Decommissioning**

1.    <u>MOGUS became primarily liable to decommission the wells</u>.

MOGUS saw the potential for value as a result of Shell's Appomattox play and decided that it was in its financial interest to become operator pursuant to federal regulations of MC 305, MC 348 and CEPS under the Final Order. MOGUS entered into the agreements and compromises with ATP to effectuate this business opportunity and assumed the risks that went along with it.   As set out below, the Final Order expressly authorized MOGUS to be designated operator of the MC 305 lease under federal regulations by the federal authorities.[10]

---

[10] MOGUS purports to argue that being designated operator under the federal regulations is the same as being the defined Operator under the Operating Agreement; however, this is not correct.   There are express processes to follow under the Operating Agreement to become Operator, and they were neither mentioned nor followed in any way.  *See* Exhibit 3, Operating Agreement, at art. 4 (addressing selection of the Operator).  In fact, MOGUS deliberately avoided being assigned ATP's interests in the Operating Agreement.  *See* Exhibit 4, Final Order, at Exhibit 3 thereto [Doc. 2987-4], at p. 4 of 10 (listing the Operating Agreement as a contract to be assumed by ATP and not assigned to MOGUS).

- The express language of the Final Order at paragraph 24 states, "[T]o the extent possible under applicable regulations, the Debtor [ATP] is authorized to designate MOGUS as operator of Lease OCS-G 19935 covering Mississippi Canyon 305 (**"MC 305"**)."[11]

- The Final Order at paragraph 59 further states, "The Debtor [ATP] is authorized and ordered to designate MOGUS operator for any of the other Canyon Express Assets for which such designation is appropriate or allowed under applicable Agency regulations."

- The Abandonment Fund Agreement at paragraph 1 states, "Marubeni shall be designated as operator of the Aconcagua and Camden Hills leases" by the government authorities.  (The Aconcagua Lease is defined as covering MC 305.).[12]

There was no mention of the Operating Agreement, and MOGUS did not become the Operator under the terms of the Operating Agreement.  MOGUS was neither elected nor did it become the "Operator" as that term in used in the MC 305 Operating Agreement.  As a result, the decommissioning operations that were undertaken by MOGUS were not "Operations" under the Operating Agreement. The decommissioning was not performed by the "Operator" nor was it undertaken after an election or with the approval of the other Participating Parties.  Therefore,

---

[11] *See* Exhibit 4, Final Order [Doc. 2987], at p. 18.

[12] *See* Abandonment Fund Agreement [Doc. 2987-1], attached as Exhibit 1 to the Final Order, at p. 3 of 20 & 14 of 20.  Further, in response to a request that MOGUS "[a]dmit that MOGUS became the designated operator of the MC 305 Wells under the BOEM regulations," MOGUS stated that BSEE designated "MOGUS as the operator in its EWell [permitting and reporting] system."  *See* Request for Admission 27, attached hereto as Exhibit 8.

the Operating Agreement cannot provide the basis of any liability of TEP USA or any other party, past or present.[13]

In entering into the compromises with ATP in the ATP bankruptcy, MOGUS acted for MOGUS' own benefit, having agreed to become the designated operator under the federal regulations of the wells, in what appears to be an effort to exploit the CEPS and Appomattox project development.  As part of the Final Order, MOGUS received additional consideration in the form of a portion of the ATP overriding royalty interest in Appomattox, all of ATP's interests in the CEPS, and equipment referred to in the Final Order as the CE Inventory.[14]  Having taken on the decommissioning obligations and received consideration for its compromises in the ATP bankruptcy, MOGUS cannot now seek to undo the arrangement and pursue TEP USA when it did not work out for MOGUS.

2.    The decommissioning was deemed performed by ATP.

Under the Abandonment Fund Agreement, MOGUS agreed that the decommissioning was deemed performed by ATP.[15]  Once ATP's obligations are deemed performed and are satisfied, there is nothing remaining to request or

---

[13] MOGUS' PSJ Motion is conspicuously silent on this distinction.  MOGUS has not provided any documentation as to how it became and/or acted as "Operator" under the MC 305 Operating Agreement, and for that reason alone summary judgment should be denied.

[14] *See* Exhibit 4, Final Order, at ¶ Q; Abandonment Fund Agreement [Doc. 2987-1], attached as Exhibit 1 to the Final Order, at p. 4 of 20.

[15] *See* Abandonment Fund Agreement [Doc. 2987-1], attached as Exhibit 1 to the Final Order, at p. 4 of 20 (emphasis added).

pursue from TEP USA.  Under Louisiana law, extinguishment is a defense to a claim.[16]  MOGUS argues that the Final Order "expressly preserved MOGUS' rights to pursue claims for reimbursement and/or contribution for decommissioning expenses against ATP's predecessors, such as [TEP USA],"[17] but the Final Order does not create any rights for MOGUS.[18]  While MOGUS preserved what rights it had at the time of the Final Order, the Abandonment Fund Agreement includes MOGUS' agreement to ATP being deemed to have satisfied its obligations, leaving nothing for MOGUS to claim against TEP USA.

> 3. <u>The zero "cure amounts" eliminated any existing ATP defaults when the Operating Agreement was assumed by ATP.</u>

Under bankruptcy law, when a contract is assumed, any existing defaults are required to be cured.  Accepting a zero cure amount when a lease is assumed means giving up the right to pursue defaults that existed at the time of the assumption.  *See In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004), supplemented, 00-00844(PJW), 2005 WL 1331257 (Bankr. D. Del. June 6, 2005).  In this instance, the cure amount (under 11 U.S.C. § 365 of the Bankruptcy

---

[16] *See, e.g.* La Civ. Code art. 1854.
[17] Doc. 25, at p. 3.
[18] Exhibit 4, Final Order, at ¶ 63

Code) was set at zero when ATP assumed the Operating Agreement, and MOGUS did not object to the zero cure amount.[19]

Thus, "a bankruptcy court order approving the assumption of an executory contract . . . is necessarily a finding that no uncured defaults exist." *Arriva Pharmaceuticals, Inc. v. Lezdey* (*In re Arriva Pharmaceuticals, Inc.*), 456 B.R. 419, 424 (Bankr. N.D. Cal. 2011).[20] Therefore, the effect of a cure in conjunction with an assumption or assignment of an executory contract is at least an implicit finding by the bankruptcy court that there are no outstanding pre-assumption defaults in the executory contract; any default that would have existed under non-bankruptcy law must necessarily have been satisfied. *See, e.g., In re Kennesaw Dairy Queen Brazier*, 28 B.R. 535, 536 (Bankr. N.D. Ga. 1983).

In its Motion, MOGUS asserts that decommissioning liability had accrued before the lease terminated in 2013.[21] Accordingly, decommissioning would have been among the defaults that existed at the time of ATP's assumption of the Operating Agreement. As a result, MOGUS is now precluded from pursuing

---

[19] *See* Exhibit 3 to the Final Order [Doc. 2987-4], at p. 4 of 10; *see also* Final Order at ¶ 32; Final Order, at ¶ V. (citing Exhibit 10 to the Motion [Doc. 2937] in the ATP Bankruptcy).

[20] *See also NCL Corp. v. Lone Star Bldg. Ctrs. (Eastern),* 144 B.R. 170, 179 (Bankr. S.D. Fla. 1992); *In re Diamond Mfg. Co., Inc.,* 164 B.R. 189, 201 (Bankr. S.D. Ga. 1994) ; *In re Ali Properties, Inc.,* 334 B.R. 455, 461 (Bankr. D. Kan. 2005); *In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 608 (Bankr. D. Del. 2004).

[21] *See, e.g.* Doc. 25, at p. 2-3.

ATP's decommissioning liability under the Operating Agreement and is further bound by its agreement that it will perform decommissioning if not done by ATP.[22]

## B.   MOGUS did not comply with the material terms of the Operating Agreement and therefore cannot recover pursuant to its terms.

Even if MOGUS could overcome all of the ATP bankruptcy related issues discussed above, it cannot simply select a few terms of the Operating Agreement and ask the Court to ignore all the other material terms that are conditions precedent.   There is no evidence that MOGUS ever became the designated Operator under the terms of the Operating Agreement nor that it complied with its material terms.  Because MOGUS' basis for seeking payment of decommissioning expenses under the Operating Agreement depends upon it accomplishing the decommissioning as the "Operator," MOGUS' non-Operator status under the Operating Agreement is fatal.  The "Operator" as selected under the Agreement, is given the **exclusive right and duty to conduct all operations** pursuant to the Agreement.[23]   Only the Operator is to incur and pay costs of joint operations and, then is to be reimbursed by the Participating Parties.[24]  MOGUS cannot point to the ATP bankruptcy as the source of either MOGUS' selection as Operator under the

---

[22] TEP USA's proof of claim filed prior to the 2014 Final Order simply preserved its right to make a claim against ATP under the purchase and sale agreement wherein ATP purchased TEP USA's interests in 2006 and is not relevant to any issue presented by the PSJ Motion.

[23] *See* Exhibit 3, Operating Agreement, Art. 5.1.

[24] *See* Exhibit 3, Operating Agreement, Art. 6.1.

Operating Agreement or the creation of rights against TEP USA vis-à-vis decommissioning.  Under the Final Order, ATP did not assign the Operating Agreement to MOGUS; instead, the Operating Agreement was assumed by ATP and not assigned.[25]

Further, Article 6.2 of the Operating Agreement prohibits the Operator from making "any single expenditure or undertak[ing] any activity or operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an AFE" [Authorization for Expenditure] has been approved.  *See Apache Corp. v. W&T Offshore, Inc.*, Civil Action No. H-15-0063 (S.D. Tex. Oct. 7, 2016) (holding that clauses prohibiting certain expenditures without approved AFEs with virtually identical language to the clauses at issue in this case was ambiguous and thus there was "a material question of fact as to the parties' intent.") (Hittner, J.).[26]  The decommissioning activities clearly exceeded $200,000 and TEP USA did not receive any AFE as part of an approval process.[27]

In the event MOGUS claims it was acting as Operator under the Operating Agreement (which it was not), MOGUS failed to develop an Annual Operating

---

[25] Exhibit 4, Final Order at ¶ U (citing the Motion – as that term is defined in the Final Order – at Exhibit 10, thereto); Final Order at Exhibit 3 thereto [Doc. 2987-4], at p. 4 of 10.

[26] *See* Exhibit 5. This factual issue, in and of itself, would preclude the grant of summary judgment as requested by MOGUS.

[27] TEP USA was provided a copy of an incomplete AFE as part of MOGUS' demand for payment of costs, not an approval process.  Abney Decl. at ¶ 14.

Plan for submission to the Non-Operating Parties.[28]   However, MOGUS has not shown that it ever submitted an Annual Operating Plan, let alone that it included estimates for decommissioning costs, and TEP USA never received an Annual Operating Plan for the MC 305.[29]

In fact, MOGUS never treated TEP USA as a partner under the terms of the Operating Agreement.   MOGUS never held a meeting with all joint interest partners regarding the decommissioning or, if it did, MOGUS did not invite TEP USA to participate.[30]   TEP USA did not receive a scope of work for the decommissioning, nor did MOGUS seek TEP USA's input for the decommissioning process.[31]

Finally, to the extent Louisiana law is deemed to apply,[32] all contracts must be performed in good faith.  *See* La. Civ. Code art. 1759 ("Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."). Moreover, the Louisiana Civil Code expressly bars the recovery of damages where a claimant's bad faith causes the obligor's failure to perform.  La. Civ. Code art. 2003.   MOGUS has not established that it performed its obligations under the

---

[28] *See* Exhibit 3, Operating Agreement, Art. 6.4 & 6.4.2; Abney Decl., at ¶ 16.

[29] Abney Decl., at ¶ 16.

[30] Abney Decl., at ¶ 10.

[31] Abney Decl., at ¶¶ 8, 10.

[32] MOGUS has not even submitted sufficient evidence to establish what law applies.  MOGUS' Motion [Doc. 25] at p. 9–11. Judge Atlas cited this deficiency in her ruling granting TEP USA's Motion under Rule 56(d).   Doc. 37.  *See* footnote 1 above.

Agreement in good faith.  As a result, MOGUS has failed to establish that it fulfilled all conditions precedent and that it complied, in good faith, with the material contract requirements necessary to seek payment from TEP USA under the Operating Agreement.

## C.    Genuine disputed issues of material fact preclude summary judgment and additional discovery is needed.

Not only has MOGUS failed to carry its burden of establishing that all conditions precedent have been fulfilled and that it complied with the material terms of the contract in good faith, discovery is necessary on many issues to complete the record and to give TEP USA access to all of the facts as it responds to MOGUS' Motion.[33]  These issues are more fully set forth in TEP USA's Motion Pursuant to Rule 56(d) [Doc. 32], which is incorporated herein as if fully set forth herein.  For these reasons, MOGUS' Motion should be denied or deferred pursuant to Rule 56(d).

## D.    MOGUS' argument misconstrues the Operating Agreement and ignores its material terms.

MOGUS cites several cases for the proposition that the substantive law in the states of Texas, Louisiana, and Alabama provides *generally* that an assignment

---

[33] The Court has previously denied MOGUS' request to stay discovery pending its decision on MOGUS' Motion.  *See* Order Denying Marubeni Oil & Gas (USA), Inc.'s Mtn. to Stay Discovery Pending Decision on Mtn. for Partial Summary Judgment (Jan. 6, 2017) [Doc. 36].  To date, TEP USA has received no documents in response to its discovery requests.

of interest, without more, does not release the assignor from its obligations under an agreement.[34]  What these cases do not hold, and cannot hold without examining the contract at issue, is whether the assignment of interest relieves the assignor of financial obligations for decommissioning operations.[35]  MOGUS' proposed interpretation of Articles 24.1.4 and 18.4 requires the Court to ignore rules of contract interpretation by ignoring key language.

When construing a contract, the Court must "examine the entire document and *consider each part with every other part* so that the effect and meaning of one part on any other part may be determined." *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (emphasis added).  Words must be given their plain meaning.  *Nippon Oil Exploration U.S.A., Ltd. v. Murphy Exploration & Prod. Co. U.S.A.*, 2011 WL 1193005, *3 (E.D. La. 2011).  "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (emphasis in original; internal citation omitted).  Courts usually look only within the four corners of the agreement to see what is actually stated, and not at what was

---

[34] Doc. 25, at p. 13, n. 45.
[35] *See*, *e.g.*, *Indian Oil Co. v. Bishop Petroleum, Inc.*, 406 S.W.3d 644 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (rejecting such an argument, and focusing on an analysis of the contract language).

allegedly meant.  *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd).

Pursuant to Article 24.1.4, a party is not released under assignment from "obligations and liabilities *created under this Agreement prior to the effective date of the Assignment*."    (Art. 24.1.4)    MOGUS states that BSEE required abandonment, therefore Article 18.4's decommissioning obligation applies:

> The Operator shall conduct the abandonment and removal of any well, Production System or Facilities *required by a governmental authority*, and the Costs, risks and net proceeds will be shared by the Participating Parties in such well, Production System or Facilities *according to their Participating Interest Share*.

(Art. 18.4)  Giving the terms their plain meaning, the obligation is created when the government requires abandonment, not before.[36]   BSEE issued its letter to MOGUS on April 17, 2014, after the effective date of TEP USA's assignment. Abandonment under these circumstances was not an obligation created under the Agreement prior to the effective date of the assignment.

---

[36] To read this provision differently because under federal regulations a lessee accrues decommissioning liability vis-à-vis the federal government at the time a well is drilled, would render the Operating Agreement's other "plugging and abandonment" provisions nonsensical.  For example, Articles 10.3, 11.5, 13.7 expressly exclude from decommissioning obligations any party who did not consent to subsequent exploration or operation of the wellbore.  To consistently apply MOGUS' proposed interpretation throughout the contract, however, any non-consenter would have to be held liable anyway because they are jointly and severally obligated to the federal government for abandonment from the first date of drilling.

Moreover, Article 18.4 expressly identifies that Participating Parties are responsible for abandonment costs "according to their Participating Interest Share." Participating Interest Share is defined as "[…] the proportion that the Party's Working Interest bears to the total Working Interest of all the Participating Parties (unless a different basis for Cost sharing or assignment has been agreed upon by the Participating Parties)." (Art. 2.45) "Working Interest" means "[t]he record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease." (Art. 2.62) At the time BSEE ordered MOGUS to abandon the MC 305 wells, TEP USA had zero "Working Interest" in those wells. MOGUS would have the Court ignore the parties' expressly negotiated language apportioning liability in according with Working Interest and replace it with joint and several liability for all parties in the chain of title because that is the obligation owed by lessees to the federal government under federal regulations.[37] This is not a permissible interpretation. *See Indian Oil Co., LLC v. Bishop Petroleum Inc.*, 406 S.W. 3d at 657-58. *Nippon Oil* and *GOM Shelf, LLC v. Sun Operating Ltd. Partnership*, 2008 WL 901482 (S.D. Tex. March 31, 2008) do not compel a

---

[37] *See Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003) ("The regulations govern the parties' joint and several liabilities vis-à-vis the Government, not amongst themselves."). *See also* 62 Fed. Reg. 27948, 27,949-50 ("While [30 C.F.R. §250.110] determines who is liable to MMS for performance of nonmonetary obligations, it is not our intention that this rule preclude private agreements concerning the allocation of liabilities between and among the affected parties.").

contrary conclusion.  In neither case did the court acknowledge a disagreement among the parties over when an obligation or liability was created.  The decision in *LLOG Exploration Offshore, LLC v. Newfield Exploration Co.*, 2016 WL 98618 (E.D. La. Jan. 8, 2016) is similarly devoid of any argument or analysis of what obligations were contractually created prior to assignment.  Here, TEP USA disputes MOGUS' reading of Articles 18.4 and 24.1.4 to mean, without any specific reference to the federal regulation, that the parties intended to impose liability in an amount greater than an assignor's Working Interest in the lease at the time the government orders abandonment.

Finally, the inquiry into liability does not end upon interpreting of the assignment provision of a contract.  As the cases cited by MOGUS recognize, even absent a contractual release upon assignment, a release may still occur expressly or impliedly.  *See GOM Shelf, LLC v. Sun Operating Ltd. Partnership*, 2008 WL 901482, *11 (S.D. Tex. 2008); *Chieftain Int'l, Inc. v. Southeast Offshore, Inc.*, 553 F.3d 817, 820 (citing La. Civ. Code art. 1801).  As discussed *supra*, MOGUS expressly released TEP USA and others in the chain of title from decommissioning obligations through the ATP bankruptcy, and MOGUS impliedly released TEP USA from any obligations by failing to treat TEP USA as a party to the Operating Agreement at any other time post-assignment or for any other purpose.

## IV.  OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

MOGUS attaches 11 unverified exhibits to its Motion and has attached other unverified exhibits to other filings.  For the reasons more fully set forth in TEP USA's Motion to Strike, these exhibits should not be considered and should be stricken.

## V.  CONCLUSION

For the foregoing reasons, MOGUS' premature Motion for Partial Summary Judgment should be denied or at least deferred until discovery has concluded.

Dated:  January 20, 2017               Respectfully submitted,

Of Counsel:                            **BAKER & HOSTETLER LLP**

**BAKER & HOSTETLER LLP**               _/s/ Michael W. Mengis_____
L. Poe Leggette                        Michael W. Mengis (Attorney-in-Charge)
pleggette@bakerlaw.com                 mmengis@bakerlaw.com
Carey Gagnon                           State Bar No. 13941040
cgagnon@bakerlaw.com                   Erika J. Lindberg
1801 California Street, Suite 4400     elindberg@bakerlaw.com
Denver, CO 80202                       State Bar No. 24090231
Telephone: (303) 861-0600              811 Main St., Suite 1100
Facsimile:  (303) 861-7805             Houston, TX 77002-6111
                                       Telephone: (713) 751-1600
                                       Facsimile:   (713) 751-1717

Philip G. Eisenberg
peisenberg@lockelord.com
State Bar No. 24033923
Scott L. Friedman
sfriedman@lockelord.com
State Bar No. 24087543
**LOCKE LORD LLP**
600 Travis Street, Suite 2800
Houston, TX 77002
Telephone: (713) 226-1200
Facsimile:  (713) 223-3717

**ATTORNEYS FOR PLAINTIFF,**
**TOTAL E&P USA, INC.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 20, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Michael W. Mengis*
Michael W. Mengis