### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **TOTAL E&P USA, INC.** | § | **CIVIL ACTION NO.** |
| | § | |
| **Plaintiff/Counter-Defendant** | § | |
| | § | |
| **v.** | § | **4:16-CV-2674** |
| | § | |
| **MARUBENI OIL & GAS (USA) INC.** | § | |
| | § | |
| **Defendant/Counter-Claimant** | § | **JUDGE VANESSA D. GILMORE** |

### Joint Pretrial Order

TOTAL E&P USA, INC. ("Total") and Marubeni Oil & Gas (USA) LLC ("MOGUS") submit this Joint Pretrial Order pursuant to Section 6 of Judge Gilmore's Court Procedures.

### A.     Appearance of Counsel

*Counsel for Plaintiff/*
*Counter-Defendant Total:*

*Counsel for Defendant/*
*Counter-Claimant MOGUS:*

Charles Eskridge
charleseskridge@quinnemanuel.com
Karl Stern
karlstern@quinnemanuel.com
Christopher Porter
chrisporter@quinnemanuel.com
Kate Kaufmann Shih
kateshih@quinnemanuel.com
Carl Hennies
carlhennies@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
711 Louisiana St., Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000

*and*

Paul J. Goodwine
pgoodwine@loopergoodwine.com
Holly O. Thompson
hthompson@loopergoodwine.com
Taylor P. Mouledoux
tmouledoux@loopergoodwine.com
Taylor P. Gay
tgay@loopergoodwine.com
Looper Goodwine P.C.
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone: (504) 503-1500

*and*

Philip G. Eisenberg
peisenberg@lockelord.com
Alicia Castro
acastro@lockelord.com
Locke Lord LLP
600 Travis St., Suite 2800
Houston, Texas 77002
Telephone: (713) 226.1200

Kyle Schonekas
kyle@semmlaw.com
Joelle F. Evans
joelle@semmlaw.com
Schonekas, Evans, McGoey & McEachin,
LLC
909 Poydras Street, Suite 1600
New Orleans, LA 70112
Telephone: (504) 680-6050

**B.      Statement of the Case**

This case concerns the plugging and abandonment of four wells located in the Aconcagua Field located in Mississippi Canyon Block 305 ("MC 305") on the Outer Continental Shelf in the Gulf of Mexico.  MC 305 was jointly owned by various oil and gas companies whose ownership interests changed over time, and the owner's rights and obligations were governed by a contract called the "MC 305 Operating Agreement." Total was one of the original owners beginning in 1998, before assigning its entire 50% interest in MC 305 to ATP Oil & Gas Corporation ("ATP") in July 2006.  MOGUS acquired a 37.5% interest in MC 305 in 2006.

In 2012, ATP sought bankruptcy protection.  As of 2012, the only parties who held an interest in MC 305 were MOGUS, along with ATP and Black Elk, neither of whom is a party to this suit.  In April 2014, the Bureau of Safety and Environmental Enforcement ("BSEE") ordered that the wells on MC 305 be plugged, abandoned, and decommissioned because the lease had terminated and the wells were no longer producing.  Decommissioning means the safe plugging of the well hole and removal of well structures to avoid environmental damage.  MOGUS has now completed decommissioning the MC 305 wells pending final government approval. ***

In this lawsuit, MOGUS seeks reimbursement from Total based on Total's former 50% interest in MC 305.  The Court already has determined that Total is liable for its proportionate share of the costs of decommissioning MC 305 ****.  Dkt. 230.  The only remaining issue for trial is the amount of damages to which MOGUS is entitled.  MOGUS contends that Total owes damages in the amount of $33,035,499, representing 50% of the decommissioning costs incurred by MOGUS as of June 30, 2017.  Total contends that the recovery MOGUS is seeking should be reduced substantially or entirely.

> *MOGUS requests that the following language be inserted in the Statement of the Case at the indicated points.  Total is opposed to this language, believing that it should be subject to proof at trial, and that if it is inserted, it requires additional information to make it accurate and complete, as indicated in [brackets] below.  MOGUS opposes these additional inserts by Total.*

***   "Although MOGUS only owns a 37.5% interest in MC 305, MOGUS initially paid 100% of the MC 305 decommissioning costs[, after receiving substantial assets from ATP when agreeing to undertake decommissioning on its behalf].  The other prior owner of MC 305, known as a "predecessor-in-title" in oil and gas terms, reimbursed MOGUS for its 12.5% proportionate share, [but was a predecessor only to Black Elk, and entirely unrelated to ATP, Total, and the settlement that MOGUS received with ATP].  Total is the only predecessor-in-title that has refused to pay its proportionate share, [contending that the amount MOGUS is charging is inflated because of unreasonable costs, accounting errors, and assets already received]."

\*\*\*\* "and that Total breached the MC 305 Operating Agreement by failing to reimburse MOGUS for its 50% share of the decommissioning costs, [although the extent of recoverable costs has not been decided and is a question for the jury]"

### C.   Jurisdiction

There is no dispute over this Court's jurisdiction.  The Court has federal subject-matter jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1), because this action "aris[es] out of, or in connection with" operations on the Outer Continental Shelf, and federal question jurisdiction under 28 U.S.C. § 1331.  The Court has personal jurisdiction over Total and MOGUS because each company has its principal place of business in Houston, Texas.

### D.   Motions

The following motions are currently pending:

- MOGUS's Omnibus Motion in Limine (Dkt. 234)

- MOGUS's Motion in Limine to Exclude Evidence of FCPA Violations (Dkt. 235)

- MOGUS's Motion in Limine Regarding Non-Party Witness Prior Criminal Conviction (Dkt. 237)

- Total's Motion in Limine (Dkt. 238)

- MOGUS's Motion to Open and Close Argument (Dkt. 241)

The parties agree that the Court's rulings on pending motions may render aspects of this Joint Pretrial Order irrelevant, moot, or unnecessary.  The parties each specifically reserve the right to modify the PTO to conform to the Court's rulings.

MOGUS has indicated some aspects of the Joint Pretrial Order that it believes to be irrelevant, moot, or unnecessary with two asterisks (**).  Given the broad scope of the pending motions, Total believes that identifying particular aspects at this stage is more confusing than helpful, and thus Total does not join in MOGUS's identifications. Instead, Total believes that it will be easier and more efficient to sort out the relevant facts (both agreed and disputed) and law (both agreed and disputed) once the Court has ruled on the pending motions.

### E.  Contentions of the Parties[1]

**Total's Contentions:**

Total contends that the damages MOGUS seeks in this action should be significantly reduced if not completely eliminated.  *First*, MOGUS seeks to recover costs that were unreasonable and unnecessary to decommissioning the MC 305 Wells, including the redundant costs of using the Wild Well Control 7 Series to perform decommissioning instead of using the conventional method with a rig it already had under contract.  *Second*, MOGUS's recovery should be reduced by the value of the ORRI MOGUS received free and clear in the ATP bankruptcy proceeding.  *Third*, MOGUS could have avoided all of its the damages it now seeks by securing a performance bond from ATP when MOGUS first suspected that ATP was having financial difficulties. *Fourth*, many of the costs MOGUS seeks to recover are improper and overstated from an

---

[1]  MOGUS objects to Total's placement of its contentions before MOGUS's, both in this pre-trial order and in the proposed jury instructions and verdict form.  Total's declaratory judgment action has already been resolved in favor of MOGUS, and Total is not the plaintiff on any remaining claims.  Further, MOGUS has filed a Motion to Open and Close Argument which remains pending. (Dkt. 241).

accounting perspective, adding millions of dollars to the amount MOGUS seeks to charge to Total.[2]

**MOGUS's Contentions:**

MOGUS is entitled to the full damages it seeks in this matter, plus interest, attorneys' fees, and litigation costs as allowed by the MC 305 Operating Agreement and by law. MOGUS incurred and paid $66,070,998 in costs to plug and abandon the MC 305 Wells, and Total expressly agreed under the MC 305 Operating Agreement that it would reimburse the operator, presently MOGUS, for 50% of those costs, being $33,035,499. The Court has already found that Total is liable for its 50% share of these abandonment costs. Total has no claims for offset, reduction, or elimination of any damages because (a) it has no rights to assert such claims under the MC 305 Operating Agreement having previously assigned those rights to ATP and (b) such claims are contrary to the MC 305 Operating Agreement, are not recognized by law, have already been disallowed by this Court's Order regarding the parties' cross motions for summary judgment (Dkt. 230), and/or are not supported by the record developed in this case.[3] On the accounting issues, MOGUS's retained COPAS and accounting expert effectively

---

[2]   Total's position is that MOGUS has not made clear what it specifically seeks when it asks for a "ratification of the liability ruling" post-June 2017 for "all costs that have been accrued since the date of the damages award to date and prospectively." *See infra* n.4. To the extent this means MOGUS requests a blank check for all costs after June 2017, Total objects. Given the hundreds of thousands of dollars in improper charges that Total's accounting expert has already identified, Total retains the right to audit, object and, if necessary, litigate any charges after June 2017. Total also objects to MOGUS's characterization of "disputed" and "undisputed" charges.

[3]   Certain of these issues are further addressed in MOGUS's trial memorandum filed contemporaneously herewith and in its Ominibus Motion in Limine (Dkt. 234) pending with this Court.

conducted an audit of the applicable joint account for MC 305, rendered expert reports in conjunction therewith, reviewed the parallel analysis of accounting issues conducted by Total's retained COPAS and accounting expert, and, based upon these efforts, recommended adjustments to the amount due and owing from Total and re-apportioned select charges to the other Canyon Express assets or eliminated them from the Canyon Express project. Such adjustments are commonplace and consistent with oil and gas projects of this magnitude, were accepted and recognized by MOGUS, and are incorporated into MOGUS's damages claims. MOGUS contends that, based upon the experts' analysis, Total disputes approximately $3,400,000 of the charges, with the remaining $29,600,000 undisputed.[4]

**F.    Admissions of Fact**

The following facts have been stipulated and admitted by the parties and require no proof:

1.    Effective May 1, 1998, Mariner Energy, Inc. and Elf Exploration, Inc. (Total's corporate predecessor) entered into Lease No. OCS-G 19935 with the United States, covering Mississippi Canyon Block 305 ("MC 305") on the Outer Continental Shelf in the Gulf of Mexico.

2.    MC 305 is also known as Aconcagua.

3.    Effective May 1, 1998, Elf Exploration, Inc., Mariner Energy, Inc., and Pioneer Natural Resources USA, Inc. entered into an Operating Agreement covering Mississippi Canyon Block 305 ("MC 305 Operating Agreement").

---

[4]    In addition, any judgment eventually entered by the Court must, in addition to the amount determined to be due by the Court and/or jury through June 2017, include ratification of the liability ruling to ensure that MOGUS will be reimbursed by TOTAL for all costs that have accrued since the date of the damages award to date and prospectively.

4.      TOTAL E&P USA, INC. is the successor in name to TotalFinaElf E&P USA, Inc.  TotalFinaElf E&P USA, Inc. was the successor in name to Elf Exploration, Inc.  As used herein, "Total" refers to TOTAL E&P USA, INC., including as successor to TotalFinaElf E&P USA, Inc. and Elf Exploration, Inc.

5.      MC 305 was one of three fields connected to the Canyon Express Pipeline System ("CEPS"), a deepwater pipeline gathering system on the Outer Continental Shelf.  The other two connected fields were Camden Hills (Mississippi Canyon 348) and King's Peak (Mississippi Canyon 173, Mississippi Canyon 217, Desoto Canyon 133, and Desoto Canyon 177).

6.      As used in the Joint Pretrial Order, Aconcagua, Camden Hills, King's Peak, and CEPS are sometimes collectively referred to as "Canyon Express."

7.      Ownership interests in MC 305 changed over time.  Total and MOGUS agree that the historical ownership interests in MC 305 are illustrated by the chart designated as Exhibit A.

8.      Total held a 50% record title interest in MC 305.

9.      In addition to holding a 50% interest in the MC 305 Lease and Wells, Total also held a 16.67% interest in the MC 348 Lease and Wells prior to its assignment to ATP.

10.     Total, as operator of MC 305, drilled four oil and gas wells on MC 305 ("MC 305 Wells").

11.     In January 2006, MOGUS acquired a 37.5% record title interest in MC 305.

12.     From January 2006 to the present, MOGUS has held a 37.5% record title interest in MC 305.

13.     In July 2006, Total assigned its entire 50% record title interest in MC 305 to ATP Oil & Gas Corporation ("ATP").

14.     Since January 2010, record title in MC 305 has been held as follows: MOGUS 37.5%; ATP 50%; and Black Elk Energy Offshore Operations, LLC ("Black Elk") 12.5%.

15.     Black Elk had acquired its 12.5% interest from Nippon Oil Exploration U.S.A. Limited ("Nippon").

16.     ATP filed for bankruptcy on August 17, 2012.

17.    Total did not request that BOEM demand supplemental bonds from ATP.**

18.    MOGUS did not request that BOEM demand supplemental bonds from ATP.**

19.    MOGUS became operator of MC 305 in 2014.

20.    On April 17, 2014, the Bureau of Safety and Environmental Enforcement ordered MOGUS and Black Elk to decommission the MC 305 Wells.

21.    Black Elk was placed into involuntary bankruptcy on August 11, 2015.

22.    In May 2014, MOGUS and Wild Well Control, Inc. ("Wild Well") executed a Letter of Intent.**

23.    On September 15, 2015, MOGUS and Ensco Offshore Company executed an Offshore Daywork Drilling Contract to utilize the Ensco 8505 semi-submersible rig.

24.    On September 29, 2015, MOGUS and Wild Well executed a Work Order.

25.    The Ensco 8505 rig departed the shipyard in Ingleside, Texas on December 23, 2015.

26.    The rig arrived at the first of the MC 305 Wells on January 4, 2016.

27.    MOGUS's decommissioning of the MC 305 wells was part of a larger campaign to decommission all the "Canyon Express" wells, which included four wells at MC 305, two wells at Camden Hills, three other wells at King's Peak, and the CEPS pipeline.

28.    MOGUS has completed abandonment of the four MC 305 Wells pending final government approval.

29.    MOGUS sent ATP and Black Elk monthly "joint interest billing statements" ("JIBs") to seek reimbursement for each party's proportionate share of the decommissioning expenses incurred.

30.    Commencing around June 2016, MOGUS sent invoices for the decommissioning costs incurred to Total.

31.    Subject to the Court's approval, the parties have agreed to submit all issues related to the amount of attorney's fees and costs to the Court after the jury's verdict.

### G.     Contested Issues of Fact[5]

1.      The amount incurred by MOGUS to plug, abandon, and decommission the MC 305 Wells.

2.      The sum of money that will place MOGUS in the same position if Total had not breached the MC 305 Operating Agreement.

3.      Whether the costs incurred by MOGUS to plug, abandon, and decommission the MC 305 Wells were reasonable and necessary.

4.      Whether Total's liability to MOGUS can be reduced based on the "reasonableness" of costs where there has been no allegation of gross negligence or willful misconduct.**

5.      Whether, and in what amount, MOGUS's damages should be reduced based on consideration, if any, MOGUS has received towards the decommissioning obligations.**

6.      The amount currently in the abandonment fund.**

7.      Whether MOGUS has received any "consideration" to be applied against Total's decommissioning obligations.**

8.      Whether MOGUS received such "consideration" from a party that shared with Total a joint obligation to MOGUS.**

9.      Whether, and in what amount, MOGUS's damages should be reduced because of improper charges and allocations and other accounting errors.

10.     Whether MOGUS could have avoided all the costs incurred to plug, abandon, and decommission the MC 305 Wells by requesting supplemental performance bonds by ATP.**

11.     Whether Total could have avoided all the costs incurred to plug, abandon, and decommission the MC 305 Well by requesting supplemental performance bonds by ATP.**

---

[5]     Total believes that many of these contested assertions are not necessarily disputed as a factual matter, but are either misleading without proper context, or irrelevant and therefore misleading if presented as a fact pertinent to this trial.  Thus, Total will require proof of these facts to the extent admissible at trial.  MOGUS disputes Total's characterization and objects to Total's attempt to include argumentative qualifiers in the pretrial order.

12.   Whether MOGUS or Total had any authority to request that BOEM issue a demand for supplemental performance bonds by ATP.**

13.   Whether MOGUS's use of Wild Well and the riser-less system to plug and abandon the MC 305 Wells was reasonable and/or necessary.**

14.   Whether MOGUS's use of Wild Well and the riser-less system to plug and abandon the MC 305 Wells constitutes gross negligence or willful conduct.**

15.   Whether MOGUS properly allocated the costs associated with the Ensco 8505 rig.

16.   Whether MOGUS properly allocated the costs incurred during downtime as the Wild Well riser-less system was being debugged on the first MC 305 well to be abandoned.

17.   Whether MOGUS properly allocated the costs associated with the diagnostic well testing and other work performed by the *M/V Spearfish*.

18.   Whether MOGUS properly allocated the costs associated with other vendors that served MC 305 and other MOGUS projects.

19.   Whether MOGUS has charged MC 305 for work and services actually performed on other MOGUS projects.

20.   Whether, every consultant, vendor, and contractor utilized by MOGUS on the MC 305 decommissioning project invoiced MOGUS only for work associated with MC 305.

21.   Whether MOGUS seeks costs from Total beyond the costs of abandonment for which this Court has ruled that Total is liable.

22.   Whether MOGUS has failed to substantiate charges to MC 305.

23.   The extent to which Total has alleged that MOGUS failed to substantiate charges to MC 305.

24.   Whether, and the extent to which, MOGUS was required to substantiate charges to MC 305.

25.   Whether Total is required to pay interest.

26.   The amount, if any, of interest owed by Total to MOGUS on the unpaid invoices for MC 305.

27.     Whether Total is required to pay attorney fees, court costs, and any other costs .

28.     The amount, if any, of attorney fees, court costs, and other costs that MOGUS is entitled to recover in connection with the collection of unpaid amounts (reserved for resolution by the Court after trial).

29.     Whether the MC 305 Operating Agreement provides, in relevant part: **

5.1     **Exclusive Right to Operate:**  Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement.   In performing services under this Agreement for the Non-Operators, the Operator is an independent contractor, not subject to the control or direction of Non-Operators, except for the type of operation to be undertaken in accordance with the voting and Election procedures in this Agreement.   The Operator is not the agent or fiduciary of the Non-Operators.  With the exception of any Feasibility Study team or Project Team formed pursuant to this Agreement, the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services rendered shall be determined by the Operator.   All such employees or contractors shall be the employees or contractors of the Operator.  The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement, regardless of which rig a Non-Operating Party included in a well proposal submitted by such Non-Operating Party.

5.2     **Workmanlike Conduct**:  The Operator shall conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances.  The Operator shall not be liable to the Non-Operators for losses sustained or liabilities incurred, except as may result from Operator's gross negligence or willful misconduct.  Unless otherwise provided in this Agreement,  Operator shall consult with the Non-Operators and keep them all informed of all important matters.

22.5    **Liability for Damage:**  . . . [L]iability for losses, damages, Costs, expenses or Claims involving operations under this Agreement . . . shall be borne by each Party in proportion to its Participating Interest Share in the operation out of which such liability arises, except that when liability results from the gross negligence or willful misconduct of a Party, such Party shall be solely responsible for liability resulting from its gross negligence or willful misconduct.

12

30.     Whether MOGUS and Wild Well personnel had the first of many meetings with representatives of BSEE and BOEM in New Orleans, Louisiana in May 2014 to discuss the work and regulatory requirements applicable to the work.**

31.     Whether, by letter dated July 8, 2013, ATP advised BSEE that effective immediately they would not perform any required maintenance or decommissioning activities at MC 305.

32.     Whether, in May 2014, Wild Well had ever decommissioned or abandoned a well in depths greater than 2,500 feet of water.**

33.     Whether, in May 2014, any well at a depth greater than 2,500 feet had ever been abandoned using a riser-less system.**

34.     Whether well abandonment prior to May 2014 had been done using a rig and riser.**

35.     Whether, in May 2014, Wild Well was developing upgrades to its 7 Series equipment to work in 7,000 to 10,000 feet of water.**

36.     Whether Wild Well's 7 Series had previously been utilized in shallower water depths on several other projects with different operators.**

37.     Whether MOGUS had previously utilized Wild Well and the 7 Series in 2013 for a project on MOGUS's Angus/Manatee project.**

38.     Whether, over an eighteen month period, MOGUS and Wild Well planned and developed the system components necessary to accomplish safe and effective well abandonment operations in extreme water depths.**

39.     Whether BSEE approved MOGUS's use of Wild Well's riser-less abandonment system.**

40.     Whether use of Wild Well (or any other riser-less system) was required by federal regulations.**

41.     Whether a rig and riser could have plugged and abandoned the MC 305 Wells consistent with the federal regulations.**

42.     Whether the abandonment work on the MC 305 Wells was accomplished in 108 days with no safety lapses, lost time incidents, environmental incidents, or regulatory non-compliance notifications.

43. Whether, during the ATP bankruptcy proceedings, the parties estimated that MC 305 decommissioning costs would be $92 million.

44. Whether, prior to MOGUS's performance of the decommissioning work, MOGUS budgeted $80.8 million for the total costs of decommissioning at MC 305, and whether MOGUS, in consultation with its consultants and contractors, estimated that the MC 305 decommissioning would take 133 days.

45. Whether, prior to MOGUS's performance of the decommissioning work, Total, in a report to the CEO, estimated that: (i) the most likely amount of MC 305 decommissioning costs would be between $70-$91 million; (ii) the "high case" of MC 305 decommission costs would be between $82-$106 million; and (iii) the "low case" costs of MC 305 decommissioning would be between $53-$70 million.

46. Whether, prior to MOGUS's performance of the decommissioning work, BSEE assessed MC 305 decommissioning liability at $74.9 million.

47. Whether prior estimates for decommissioning MC 305 were meaningless because they were made before the energy market declined, and thus assumed rig rates substantially higher than the market rate when MOGUS performed decommissioning.**

48. Whether all costs directly incurred in connection with MOGUS's decommissioning operations at MC 305 were allocated 100% to MC 305; all costs directly incurred in connection with MOGUS's decommissioning operations at MC 348 were allocated 100% to MC 348; all costs directly incurred in connection with MOGUS's decommissioning operations at King's Peak were allocated 100% to King's Peak.

49. Whether, to the extent MOGUS incurred costs that were of a type common to all nine Canyon Express wells, those costs were allocated based on the number of wells in each field as follows:

    a. MC 305 (4 wells):        44.44% or 4/9

    b. MC 348 (2 wells):        22.22% or 2/9

    c. King's Peak (3 wells):   33.34% or 3/9

50. Whether MOGUS contracted the "Spearfish" vessel to learn more about the conditions of the Canyon Express wells they were tasked to plug and abandon, diagnose issues they could expect to face in the plugging and

abandonment process, deal with expected hydrate issues, and confirm they could control the wells during the plugging and abandonment process.

51.    Whether, during the Spearfish tour it became apparent to MOGUS that MOGUS needed a different, faster system for hydrate remediation and that, due to the conditions encountered, the hydrate remediation work they were doing should be done immediately prior to the Ensco rig arriving on site rather than weeks or months before. Although MOGUS gained knowledge about the general condition of the well trees and their ability to control the wells through the Spearfish diagnostic work undertaken, the decision was made to cut the tour short.

52.    Whether the MC 305 wells benefitted from the overall knowledge gained from the Spearfish tour and the decision that the tour was not economically beneficial and was in the MC 305 wells' best interest to terminate the Spearfish tour early.

53.    Whether the MC 305 wells were charged only "common costs" associated with the Spearfish and no direct costs associated with time incurred by the Spearfish while working on the MC 348 and King's Peak wells.

54.    Whether MOGUS's contract with Ensco originally contemplated that MOGUS would have use of the Ensco rig for operations on the following wells: (a) the plugging and abandonment of the nine Canyon Express wells; (b) the plugging and abandonment of a tenth Canyon Express well (in Kings Peak), which was later determined to be unnecessary; and (c) two potential drilling wells, which did not come to fruition.

55.    Whether the Ensco contract provided that, at termination, the rig would be demobilized to Grand Isle 118.

56.    Whether, on May 5, 2016, MOGUS gave Ensco verbal notice of its intent to terminate the contract and followed up with a written notice of intent to terminate on May 13, 2018.

57.    Whether, on July 25, 2016, MOGUS notified Ensco that it intended to extend the parties' contract in order to utilize the Ensco 8505 rig to complete intervention work on the Green Canyon 112 number 4 well ("GC 112 #4").

58.    Whether, prior to commencing the intervention operations at Green Canyon 112, MOGUS required that the Ensco 8505 rig proceed directly from the last Canyon Express well to Grand Isle 118, the demobilization location identified in the Ensco contract.

59.     Whether all common costs incurred to move the rig to Grand Isle 118 were charged to the Canyon Express wells; all costs incurred after the rig passed through the demobilization location and until the rig returned to Grand Isle 118 were charged to the Green Canyon 112 #4 intervention project; after the rig returned to Grand Isle 118 following the Green Canyon 112 #4 intervention, further demobilization costs that were incurred pursuant to the Ensco contract were charged to the Canyon Express P&A wells.

60.     Whether the Green Canyon 112 #4 intervention did not result in the Canyon Express P&A wells incurring any costs that they would not have incurred had the Green Canyon 112 #4 intervention not happened.

61.     Whether MOGUS failed to allocate mobilization and demobilization costs for the Ensco 8505 to Green Canyon 112.

62.     Whether the Abandonment Fund Agreement and the Contribution Agreement do not require that any proceeds from MOGUS's half of the Bennu ORRI be applied against Total's and ATP's other predecessors' share of liability.**

63.     Whether MOGUS has ever recorded any value associated with the Bennu ORRI on any of its financial statements.**

64.     Whether MOGUS has ever assigned a fair market value to the Bennu ORRI.**

65.     Whether MOGUS has ever assigned a net present value to the ORRI it received free and clear in the ATP bankruptcy proceedings.**

66.     Whether, under the terms of the Bennu ORRI, proceeds from the Bennu ORRI will be realized only if Shell Oil Company drills a producing well on the MC 348 lease block at the depths specified in the Bennu ORRI.**

67.     Whether the MC 348 portion of Shell's Appomattox reservoir is approximately 1.79%.**

68.     Whether MOGUS does not expect Shell to ever drill a producing well on MC 348 in which case the Bennu ORRI would generate no proceeds.**

69.     Whether, if Shell does not drill a producing well on MC 348, MC 348 will drop out of the Appomattox unit.**

70.     Whether Shell has made a final investment decision on the Appomattox prospect.**

71. Whether Shell is currently planning to drill a well on "Surface Block Number" MC 392, with a "Bottom Block Number" of MC 348.**

72. Whether Shell has publicized the bottom hole locations for any of its anticipated development wells at Appomattox.**

73. Whether first oil from the Appomattox prospect is expected this year.**

74. Whether, prior to July 31, 2012, ATP qualified for a supplemental bonding waiver and was exempt from the requirement to post supplemental bonds.**

75. Whether BOEM or BSEE could have required ATP to post supplemental bonds.**

76. Whether, the ownership history of MC 348, King's Peak, and CEPS and the payments and liability acknowledgement made by other predecessors on those properties.

77. All other issues of fact that arise from the Contested Issues of Law listed below.

78. MOGUS initially incurred 100% of the expenses to plug and abandon the MC 305 Wells despite never owning more than a 37.5% interest.[6]

79. ATP and Black Elk paid nothing in response to any of the JIBs issued by MOGUS.[5]

80. Through an Abandonment Fund Agreement and Contribution Agreement approved by the ATP bankruptcy court, Bennu Oil & Gas LLC ("Bennu") agreed that half of an overriding royalty interest it held in MC 348 deep rights ("Bennu ORRI") would be assigned to MOGUS and that any future

---

[6] Total does not dispute these facts proposed by MOGUS, insofar as MOGUS did initially pay 100% of the expenses it incurred to abandon MC 305 (after receiving assets from ATP in its bankruptcy to do so) and MOGUS and ATP agreed in the ATP bankruptcy that ATP did not need to pay and MOGUS could not put ATP in default. But Total does not concede whether those expenses were reasonable or otherwise properly chargeable to Total and so, they are inaccurate and misleading as phrased. MOGUS disputes Total's characterization and objects to Total's attempt to include argumentative qualifiers in the pretrial order.

proceeds from the other half would be deposited into an abandonment fund.**[7]

81.     Total did not object to the bankruptcy court's approval of the Abandonment Fund Agreement and Contribution Agreement.**[6]

82.     Any future proceeds from the abandonment fund portion of the Bennu ORRI will be applied against Total's and ATP's other predecessors' share of liability.**[6]

83.     Black Elk's sole predecessor-in-title, Nippon, has acknowledged its liability to MOGUS for the MC 305 plugging, abandonment, and decommissioning costs and has paid, and continues to pay as invoices are submitted, its proportionate share of 12.5%.[8]

84.     Total is the only predecessor-in-title that has not acknowledged its liability to MOGUS for plugging, abandonment, and decommissioning expenses for the Canyon Express decommissioning operations or paid its proportionate share.[7]

85.     The ownership history of MC 348, King's Peak, and CEPS and the extent to which other predecessors on those properties have made payments and acknowledged their liability to MOGUS.[7]

---

[7]     Total does not dispute these facts proposed by MOGUS but contends that they are irrelevant to whether and to what extent the other half of the ORRI—which MOGUS received free and clear as partial consideration for its agreement to perform abandonment on ATP's behalf—should be credited against the proportionate share of ATP's obligations for which MOGUS seeks in these proceedings to charge Total.  MOGUS disputes Total's characterization and objects to Total's attempt to include argumentative qualifiers in the pretrial order.

[8]     Total does not dispute that the only other predecessor-in-title to MC 305, Nippon, has reached a settlement with MOGUS to pay abandonment costs.  However, that settlement is not an acknowledgement of liability, and Nippon was a predecessor to Black Elk and not ATP.  More fundamentally, what other predecessors have done, particularly in the posture of a settlement, is legally irrelevant to this damages trial.  To the extent any predecessor acknowledged liability, it did so pursuant to a separate Plugging and Abandonment Agreement to which Total is not a party.  MOGUS disputes Total's characterization and objects to Total's attempt to include argumentative qualifiers in the pretrial order.

**H.     Agreed Applicable Propositions of Law**

1.     The Court has determined that Alabama contract law applies to fill any gap in federal law.  *See* Dkt. 228.

2.     The Court has determined that Total "remains liable for its proportionate share of the costs of decommissioning MC 305."  *See* Dkt. 230.

3.     Decommissioning of the MC 305 wells was required under federal regulations.  *See* 30 CFR 250.1710; 30 CFR 250.1711.

4.     "In computing damages for breach of contract, a jury need not achieve 'mathematical precision.'"  *Mannington Wood Floors, Inc. v. Port Epes Transport, Inc.*, 669 So. 2d 817, 822 (Ala. 1995) (quoting *United Bonding Ins. Co. v. W.S. Newell, Inc.*, 380, 232 So. 2d 616, 624 (1969)).

**I.     Contested Issues of Law[9]**

1.     Whether "[d]amages awarded for breach of contract should return the party to the position he would have occupied had the contract not been violated." *E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas*, 559 F.2d 268, 269 (5th Cir. 1977) (applying Alabama law) (citing *Jewell v. Jackson & Whitsitt Cotton Co*., 331 So. 2d 623, 625-26 (Ala. 1976)); *see also Med Plus Properties v. Colcock Const. Group, Inc*., 628 So. 2d 370, 375 (Ala. 1993); *Sanders v. J.W. Snyder Const. Co., Inc.*, 681 So. 2d 576, 579 (Ala. Civ. App. 1996) ("The measure of damages in a breach of contract case is 'that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached.'") (quoting J*oiner v. Holland & Woodard Co*., 652 So. 2d 261, 262 (Ala. Civ. App. 1994)).

2.     Whether "[i]n every suit for recovery of expenses incurred as the result of another's wrong, there may be recovered only such amounts expended as are *reasonable* under the circumstances," and whether *"[p]roof of reasonableness* of the amount claimed is incumbent upon the claimant." *Jack Gray Transp., Inc. v. Guinn*, 473 So. 2d 528, 528 (Ala. Civ. App. 1985) (emphasis in original); *see Union Springs Tel. Co. v. Green*, 255 So. 2d 896, 901 (Ala. Civ. App. 1971) (party recovering costs must show that costs were "reasonable under the circumstances").

---

[9]     Total believes that many of these contested issues of law are not necessarily disputed as to their validity, but are either misleading without additional legal principles to put them in proper context or inapplicable, and therefore misleading, if presented as a legal question pertinent to this trial.  MOGUS disputes Total's characterization and objects to Total's attempt to include argumentative qualifiers in the pretrial order.

3.      Whether, under Alabama contribution law, the obligor who "discharges [] a [common] liability can recover the excess paid over his share of the obligation." Contribution in Contract, Alabama Law of Damages, § 10:5 (6th ed.); *see also Salter v. Odom*, 199 So. 687, 689 (Ala. 1940).

4.      Whether the MC 305 Operating Agreement requires a showing of "gross negligence" or "willful misconduct" by Total in order for Total to avoid liability for decommissioning costs.  MC 305 Operating Agreement, at ¶¶ 5.1, 5.2, 22.5; *see, e.g., Chesapeake Operating, Inc. v. Sanchez Oil & Gas Corp.*, 2012 WL 2133554 (S.D. Tex. June 12, 2012).**

5.      Whether Total is liable for interest, costs, and attorney's fees pursuant to the MC 305 Operating Agreement.

6.      Whether the MC 305 Operating Agreement provides that "each Party shall pay its proportion of all bills within fifteen (15) days of receipt date.  If payment is not made within such time, the unpaid balance shall bear interest compounded monthly using the U.S. Treasury Bill three month rate plus 3% in effect on the first day of the month for each month that the payment is delinquent or the maximum contract rate permitted by the applicable usury laws in the jurisdiction in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.  Interest shall begin accruing on the first day of the month in which the payment was due."  MC 305 OA, at ¶ I(3)(b) of Exh. "C" thereto.

7.      Whether all contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed.  Ala Code § 8-8-8.

8.      Whether "[a]ny consideration received by the obligee for a contract not to sue one promisor discharges the duty of each other promisor of the same performance to the extent of the amount or value received." *Restatement (Second) of Contracts* § 295; *see also id.* § 293.

9.      Whether Restatement (Second) of Contracts §§ 293 and 295 apply under Alabama law.

10.     Whether Bennu was jointly and severally liable for the decommissioning of the MC 305 wells.  30 CFR 259.1701.**

11.   Whether the Bennu ORRI affects MOGUS's recovery in this case. *Har-Mar Collisions, Inc. v. Scottsdale Ins. Co.*, 212 So. 3d 892, 904 (Ala. 2016).\*\*

**J.   Exhibits**

Total's exhibit list is attached as Exhibit B.

MOGUS's exhibit list is attached as Exhibit C.

**J.   Witnesses**

Total's witness list is attached as Exhibit D.

MOGUS's witness list is attached as Exhibit E.

If other witnesses to be called at the trial become known, their names, addresses, and subject of their testimony will be reported to opposing counsel in writing as soon as they are known; this does not apply to rebuttal or impeachment witnesses.

**K.   Trial Memoranda of Law**

Total's trial memorandum of law is attached as Exhibit F.

MOGUS's trial memorandum of law is attached as Exhibit G.

**L.   Joint Proposed Jury Instructions**

The parties' joint proposed jury instructions are attached as Exhibit H.

**M.   Proposed Voir Dire Questions**

Total's proposed voir dire questions are attached as Exhibit I.

MOGUS's proposed voir dire questions are attached as Exhibit J.

**N.     Settlement**

The parties participated in a two-day mediation from May 15 and 16, 2018.  The parties were unable to reach an amicable settlement and believe that settlement efforts have been exhausted.

**O.     Trial**

The trial will be a jury trial.  Jury selection and trial are scheduled to begin on February 4, 2018.

Total believes that this case will take between three and six days to try (assuming an equal allocation of time to each party), depending on the Court's resolution of the pending motions in limine.

MOGUS believes this case will take three (3) days to try if its motions in limine are granted, but six (6) days if not granted.  MOGUS believes that there should not be equal apportionment of time because it is the true "plaintiff" here as the only party holding affirmative claims and as the party seeking monetary relief will bear the burden of proof at trial.

_____ , 2019          _____
**Date**                                **Vanessa D. Gilmore**
                                        **United States District Judge**

**Approval:**

/s/ *Charles Eskridge*_____      LOOPER GOODWINE P.C.
Charles Eskridge
Texas Bar No. 06666350                /s/ *Paul J. Goodwine*_____
charleseskridge@quinnemanuel.com     Paul J. Goodwine (Attorney-in-Charge)
Karl Stern                              LA Bar No. 23757; SDTX ID No. 437800
Texas Bar No. 19175665                Holly O. Thompson
karlstern@quinnemanuel.com            LA Bar No. 31277; SDTX ID No. 2953818
Christopher Porter                    Taylor P. Mouledoux
Texas Bar No. __                      LA Bar No. 31889; SDTX ID No. 1581156
chrisporter@quinnemanuel.com         650 Poydras Street, Suite 2400
Kate Kaufmann Shih                  New Orleans, Louisiana 70130
Texas Bar No. 24066056                Telephone: (504) 503-1500
kateshih@quinnemanuel.com           Telecopier: (504) 503-1501
Carl Hennies                          pgoodwine@loopergoodwine.com
Texas Bar No. 24104029                hthompson@loopergoodwine.com
carlhennies@quinnemanuel.com         tmouledoux@loopergoodwine.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
711 Louisiana St., Suite 500            *-and-*
Houston, Texas 77002
713.221.7000 – Telephone              SCHONEKAS, EVANS,
713.221.7100 – Facsimile               McGOEY & McEACHIN, LLC
                                         Kyle Schonekas
Philip G. Eisenberg                   LA Bar No. 11817; SDTX ID No. 305350
Texas Bar No. 24033923                Joelle F. Evans
peisenberg@lockelord.com             LA Bar No. 23730; SDTX ID No. 436275
Alicia Castro                          909 Poydras Street, Suite 1600
acastro@lockelord.com                 New Orleans, LA 70112
Texas Bar No. 24033923                Telephone: (504) 680-6050
LOCKE LORD LLP                  Telecopier: (504) 680-6051
600 Travis St., Suite 2800             kyle@semmlaw.com
Houston, Texas 77002                joelle@semmlaw.com
713.226.1200 – Telephone
713.223.3717 – Facsimile            **ATTORNEYS FOR COUNTER-**
                                         **CLAIMANT MARUBENI OIL & GAS**
                                         **(USA) LLC**

**ATTORNEYS FOR**
**PLAINTIFF/COUNTER-DEFENDANT**
**TOTAL E&P USA, INC.**

## CERTIFICATE OF SERVICE

A copy of the foregoing joint pretrial order was served on all counsel of record for the parties via CM/ECF on January 21, 2019.

/s/ *Carl Hennies*
Carl Hennies